1
2
3
4
5
6
7           UNITED STATES DISTRICT COURT

8           NORTHERN DISTRICT OF CALIFORNIA

9

10    FALALA LELEI,                                    No. C 04-5445 PJH (PR)

11                    Petitioner,               **ORDER DENYING THE**
                                                **PETITION FOR A WRIT OF**
12           v.                                 **HABEAS CORPUS**

13    A.P. KANE, Warden,

14                    Respondent.
                                        /
15

16           This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §

17    2254.  The court ordered respondent to show cause why the writ should not be granted

18    based on petitioner's two cognizable claims for relief.  Respondent has filed an answer and

19    a memorandum of points and authorities in support of it, and has lodged exhibits with the

20    court.  Petitioner has filed a traverse.  For the reasons set out below, the petition is denied.

21                                      **BACKGROUND**

22           In 1998, petitioner and four co-defendants were charged in Santa Clara County

23    Superior Court with the first degree murder of Herbert Kay on June 12, 1997.  Petitioner

24    and two co-defendants, Danny Tevaga and Christian Valdes, were tried together, and a

25    jury convicted all three of them of first degree murder and found allegations of gang activity

26    to be true.[1]  The trial court sentenced all three defendants to terms of 25 years to life in

27    _____

28           [1]Defendant Olopitoamoa Tapuloa was tried separately, and defendant Iapesa Simanu
      pled guilty to first degree murder.  A sixth person, Usupo S., a minor, was also involved in the
      crime, and he was sent to the California Youth Authority.  At the trial of petitioner, Tevaga and

United States District Court

For the Northern District of California

state prison with the possibility of parole.  The California Court of Appeal affirmed the judgment and denied a petition for a rehearing.  After the California Supreme Court denied the petition for review, petitioner filed the instant petition.

The parties do not dispute the following facts, which are derived from the opinion of the California Court of Appeal.[2]  On the night of June 12, 1997, petitioner, then aged fifteen, and his friends drove around town, stopping to drink and smoke marijuana, and they discussed finding someone to rob.  Resp. Ex. 46 at 3.  At one of their stops, petitioner's friends saw and knocked down the victim Howard Kay.  *Id.*  The group searched Kay for money while kicking and punching him.  *Id.*  Petitioner confessed to kicking Kay, punching him in the mouth, and trying to hide the body; other evidence at trial also demonstrated that he beat Kay with a broomstick.  *Id.* at 2, 3.  Howard Kay "died from massive head, face, and neck trauma caused by multiple, overlapping blunt force injuries that broke bones and cartilage in his face, skull, and neck, crushed his larynx, and caused his brain to swell."  *Id.* at 2.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the

---

Valdes, robbery-murder special circumstances were also alleged against Tevaga and Valdes, but not against petitioner, and were found true as to Tevaga.

[2]The California Court of Appeal's opinion, which addresses several claims not raised here,  sets forth a more detailed factual account that is not necessary for the resolution of the instant petition.

2

1   first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

2   reached by [the Supreme] Court on a question of law or if the state court decides a case

3   differently than [the Supreme] Court has on a set of materially indistinguishable facts."

4   *Williams (Terry)*, 529 U.S. 362, 412-413 (2000).  A state court decision is an "unreasonable

5   application" of Supreme Court authority, falling under the second clause of § 2254(d)(1), if it

6   correctly identifies the governing legal principle from the Supreme Court's decisions but

7   "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

8         A reviewing federal court may not issue the writ "simply because that court

9   concludes in its independent judgment that the relevant state-court decision applied clearly

10  established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must

11  be "objectively unreasonable" to support granting the writ.  *Id.* at 409.  When there is no

12  reasoned opinion from the highest state court to consider a petitioner's claims, the court

13  looks to the last reasoned opinion, in this case that of the California Court of Appeal.  *Ylst v.*

14  *Nunnemaker*, 501 U.S. 797, 801-806 (1991).

## DISCUSSION

16        As set forth in the order to show cause, petitioner presents the following two

17  cognizable claims for habeas relief: (1) his statement to police should have been

18  suppressed as having been taken in violation of his *Miranda* rights; and (2) his counsel was

19  ineffective in closing argument.

20  **I.   *Miranda* Rights**

21        Petitioner contends that the trial court erred in denying his motion to suppress his

22  confession to the police that he kicked Kay a few times, hit Kay in the mouth, and helped

23  hide Kay's body.  Petitioner asserts that the interviewing officers, Mike Denson and Luis

24  Verbera, failed to stop questioning him after he invoked his right to remain silent by saying

25  "Go away."  Petition at 5, Attachment to Petition at 1.

26        The California Court of Appeal watched footage of the videotaped interrogation and

27  provided the following description of the police interrogation:

28                At the beginning of the interrogation, Verbera told Lelei that they

United States District Court

For the Northern District of California

wanted to talk to him but first had to read him his rights. After that, it was up to him if he wanted to talk. Verbera explained his rights, and Lelei said he understood them. However, before waiving them, he asked what they wanted to talk about. When Verbera declined to say, Lelei said, "No. I don't want to talk to y'all. I don't know what y'all talking about." Verbera relented and said he was under arrest for murder. Lelei responded, "What? No. I don't want to talk to you." Apparently Verbera did not hear him, and Lelei repeated, "I don't want to talk to you all. I don't know what the fuck y'all talkin' about, man. Bullshit." Verbera said he had hoped Lelei would want to talk but understood. He explained that if he changed his mind, they could talk. When Lelei protested his innocence, Verbera stopped him, saying they could not talk. Thereafter, Lelei changed his mind, said he wanted to talk, and waived his rights.

Denson told Lelei that there had been a murder in Palo Alto, they had a good case against him, and now was the time for him to give his side of the story. When Lelei denied knowing anything, Denson related the potential consequences of a murder conviction. He said that because there can be degrees of culpability and the others would try to shift the blame and minimize their roles, this was his chance to explain his part. However, if he continued to deny his part, then they would leave, and he would have no choices. Lelei was unmoved and continued to deny that he was even at the scene. Verbera asked who was there. Lelei claimed ignorance but said he heard about the murder and that police had arrested a person called "'Cree.'"

Verbera continued to press Lelei, saying police would be talking to neighbors who saw the crime. He asked Lelei why it happened, but Lelei said he had no idea. With growing impatience, Denson told Lelei that he and his friends "did some stupid shit out there." He noted that they did not wear gloves or masks and police collected lots of evidence at the scene. He also noted that police were searching Lelei's house and would find more evidence linking him to the murder. Denson continued, "And that's going to make, and like I explained to you, your participation, it's going to be huge. *And if that's all you want us to go on, and you don't want us to hear your side, and you don't want us to hear your part, then tell us to go away, and we'll go away.*" [ ] Lelei quickly responded, "*Go away.*" [ ] Denson said, "Okay. We can do that." Verbera then asked, "What's going to happen Falala when you go to court and we show the jury that your finger prints are on one of the weapons that was used. Seriously, I, I, want you to be honest." Lelei said, "What?" and Verbera repeated, "What, what do you think would, what would the jury say when we say, 'Oh do you see this man's finger prints on this evidence, on this, something that was use [sic] to, you know ...'." Lelei again said he did not know what Verbera was talking about. The interrogation continued for almost an hour, after which Denson and Verbera took a break. Thereafter, Sergeant Wong continued the interrogation for a while by himself and later was joined by Denson. During the renewed interrogation Lelei admitted his involvement in the incident.

Resp. Ex. 46 at 9-10.

Claims of incorrectly admitted custodial statements are analyzed under *Miranda v. Arizona*, 384 U.S. 436 (1966). The requirements of *Miranda* are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d). *Juan*

4

United States District Court

For the Northern District of California

*H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005).  Habeas relief should be granted if the admission of statements in violation of *Miranda* "had a substantial and injurious effect or influence in determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998).

*Miranda* requires that a person subjected to custodial interrogation be advised prior to questioning that he has the right to remain silent, that statements made can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed. *Id.* at 444.  Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently. *Id.* at 475.  Such a waiver need not be express. *Id.* Whether there has been a valid waiver of *Miranda* rights depends upon the totality of the circumstances, including the background, experience and conduct of the defendant. *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986).  In the case of juveniles, this includes evaluation of the juvenile's age, experience, education, background and intelligence, and whether the juvenile has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights and the consequences of waiving those rights. *See Juan H.*, 408 F.3d at 1271 (*quoting Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

The government must prove, by a preponderance of the evidence, that the defendant was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  A showing that there was a proper recitation of *Miranda* rights and that the defendant knew his rights generally is sufficient to establish that he knowingly and intelligently waived them. *Paulino v. Castro*, 371 F.3d 1083, 1086-1087 (9th Cir. 2004).

The court concludes that petitioner has not established that the admission of his custodial statements violated his *Miranda* rights.  Petitioner argues that after he initially waived his *Miranda* rights at the start of the interview, he later changed his mind and decided to invoke his rights when he said "Go away" to Denson.  Attachment to Petition at 1.  The California Court of Appeal denied petitioner's claim based on the following

reasoning:

> The record reveals that Lelei was well aware of his right to remain silent, and how to invoke it clearly and unequivocally. Indeed clearly and unequivocally three times, and the officers acknowledge this fact and indicated they could not talk further unless he agree[d] to waive his rights. On the other hand, Lelei's "go away" statement was ambiguous at best. The record does not convince us that Lelei took Denson's challenge literally or that he intended his response to be so taken. Rather, viewed in the context of the entire interrogation, Lelei's statement was merely a sudden, defiant response to Denson's rhetorical challenge and an effort to maintain his complete denial in the face of persistent accusations that he was lying. Indeed, after Lelei said "go away," Denson said, "We can do that," and Lelei did not say "ok" or refuse to talk. Rather, he continued the dialogue with the detectives.
>
> Under the circumstances, therefore, the record does not establish that Lelei's statements after he said "go away" were involuntary and, therefore, inadmissible.

Resp. Ex. 46 at 19.

To begin with, the state court reasonably concluded that petitioner knew his *Miranda* rights well. Indeed, petitioner concedes as much insofar as he concedes that he validly waived his *Miranda* rights at the start of his interview. Attachment to Petition at 1. The record also bears out petitioner's understanding of his rights. Police interrogators recited the appropriate *Miranda* warnings, and made it clear that the colloquy would end if petitioner invoked his rights. Petitioner then repeatedly and unequivocally invoked his rights when he said, "No. I don't want to talk to y'all. I don't know what y'all talking about;" "What? No. I don't want to talk to you;" and "I don't want to talk to you all. I don't know what the fuck y'all talkin' about, man. Bullshit." Then, after Verbera told petitioner that they could talk if petitioner ever changed their mind, petitioner told him that he did change his mind, said he wanted to talk, and agreed to waive his rights. Petitioner's repeated invocation of his rights combined with his valid waiver of such rights indicate that he knew and understood both his rights and the consequences of waiving them.

The state court also reasonably concluded that petitioner did not re-invoke his rights when he said "Go away." "Go away" is an ambiguous statement – it could mean that he did not want to talk, but it could also be, as the state court explained, simply a rejection of the accusations the officers were making against him. When petitioner wanted to invoke his

6

United States District Court

For the Northern District of California

1  rights, as he did three times earlier in the interview, he did not make any ambiguous

2  statements; instead, each time he did not want to talk he said, "I don't want to talk,"

3  sometimes accompanied by profanity for emphasis.  If petitioner had wanted to stop talking

4  he would have said so and would not have chosen an ambiguous phrase like "Go away."

5  Furthermore, as noted by the state court, petitioner did not stop talking after he said, "Go

6  away," but instead continued to talk to the police about his crime.

7       As the record demonstrates that petitioner knew his rights and how to exercise them,

8  that he chose the ambiguous phrase "Go away" rather than saying that he did not want to

9  talk, and that he continued to talk to the police after saying "Go away," it was reasonable for

10  the state court to conclude that petitioner's use of this phrase was insufficient to invoke

11  *Miranda* or to indicate that he was abandoning his earlier waiver.  Consequently, the state

12  court's denial of petitioner's claim was neither contrary to nor an unreasonable application

13  of federal law, and petitioner is not entitled to habeas relief on this claim.

14  **II.    Ineffective Assistance of Counsel**

15       Petitioner claims that his trial counsel rendered ineffective assistance during closing

16  argument.  Specifically, petitioner contends that counsel conceded that petitioner was guilty

17  of first degree murder and made other misstatements of the malice requirement for first and

18  second degree murder.

19       Claims of ineffective assistance of counsel are examined under *Strickland v.*

20  *Washington*, 466 U.S. 668 (1984).  In order to prevail on such a claim, a petitioner must

21  establish two things.  First, he must establish that counsel's performance was deficient, i.e.,

22  that it fell below an "objective standard of reasonableness" under prevailing professional

23  norms.  *Id.* at 687-688.  Second, he must establish that he was prejudiced by counsel's

24  deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

25  unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

26       First, petitioner contends that counsel conceded to his guilt of first degree murder

27  based on the following statements in closing argument.  Counsel told the jury that there

28  were three possible verdicts – first degree murder based on malice aforethought, first

1    degree murder based on the felony-murder rule, and acquittal.   "I'll get to the gang part

2    later.  But you don't even get to the gang part if you come back with an acquittal, which I

3    don't think you are going to do.  You are going to find a murder here, because that's what

4    happened."  Resp. Ex. 46 at 32-33.

5            The California Court of Appeal analyzed these statements as follows:

6            Clearly counsel misspoke in that the jury had a fourth option: second
        degree murder.  However, we note that immediately after opining that a
7        murder occurred, counsel continued, "Mr. Lelei did do something.  We don't
        know exactly what he did."  Moreover, counsel later argued that Lelei was
8        intoxicated and did not form the specific intent to kill – i.e. express malice.
        Nor did Lelei know about the robbery in advance or form the specific intent to
9        commit robbery.  Thus, counsel urged the jury not to find express malice or
        specific intent.  Rather, he argued that at most Lelei committed second
10       degree murder based on implied malice.

11           Viewing counsel's entire argument, we do not agree that he conceded
        guilt for first degree murder or that a reasonable jury would have thought so.
12       Moreover, although counsel did not expressly correct his misstatement
        concerning the number of options the jury had, he implicitly did so by asking
13       the jury to find second degree murder.  Furthermore, the court's instructions
        informed the jury concerning the number and nature of options before it.
14       Under the circumstances, therefore, counsel's misstatement was harmless.

15   *Id.* at 33.

16           The California Court of Appeal's analysis is reasonable.  Given petitioner's

17   confession to his involvement in the crime, counsel had to concede that petitioner had

18   some culpability.  Reviewing counsel's argument as a whole, however, it is clear that he did

19   not concede that petitioner was guilty of first degree murder.  Rather, counsel argued at

20   length against such a verdict, specifically that petitioner had neither malice nor specific

21   intent to kill, that petitioner did not act with premeditation, that petitioner did not intend the

22   robbery, and that if petitioner was guilty of anything, it was at most second degree murder.

23   Reporter's Transcript ("RT") at 2460-66.  In the context of such argument, the state court

24   could reasonably find that counsel's single statement that a murder had occurred was an

25   isolated misstatement, and certainly not one the jury could reasonably understand to be a

26   concession to first degree murder.  As a result, after considering counsel's argument as a

27   whole, the state court reasonably concluded that counsel did not concede to petitioner's

28   guilt of first degree murder.

**United States District Court**
For the Northern District of California

1    Petitioner also argues that in closing argument counsel failed to tell the jury explicitly

2   that premeditation and deliberation are required for first degree murder, and incorrectly

3   indicated that second degree murder does not require malice.  Petitioner's argument is

4   based on the following portion of counsel's closing argument:

5          If you don't find the felony murder rule applies in this particular case,
         then you move into is it just a regular, ordinary first degree murder with malice
6          aforethought. [¶]  Now, there's going to be instructions on all this. A lot of
         instructions. But malice aforethought is the person thought about it, reflected
7          on it, and went and did it. That's malice aforethought. It's not something,
         whoa, I'm going to go kick him. No, there is no thinking there. [¶] Okay. What
8          did he do? Did he think about it? I'm going to kick that guy and kill him? Did
         he think that was going to happen, or I'm going to go kick that guy and
9          probably he'll die? If you didn't think about it, there is no malice aforethought,
         in which case you are left with second degree murder, which doesn't apply to
10         felony murder rule and doesn't apply to malice aforethought.

11   Resp. Ex. 46 at 33-34.

12    As the California Court of Appeal reasonably explained, while counsel did not

13   explicitly state that "deliberation" and "premeditation" were required for first degree murder,

14   counsel's argument did convey these concepts to the jury insofar as counsel explained that

15   first degree murder required the jury to find that petitioner had thought about killing Kay in

16   advance and reflected upon doing so before kicking him. *Id.* at 34.  Counsel made

17   numerous other arguments that petitioner did not have the requisite mental state to be

18   guilty of first degree murder by arguing to the jury that petitioner simply joined in when he

19   saw a group of people kicking Kay and did not give any thought to killing him, that petitioner

20   did so in order to gain acceptance by the group of older men, and that petitioner had been

21   drinking and did not have a specific intent to commit the robbery. *Id.*  Furthermore, as

22   counsel indicated, the jury instructions on first degree murder informed the jury that first

23   degree murder required "premeditation" and "deliberation," and thus counsel's argument

24   did not need to use these precise terms in his argument.

25    The California Court of Appeal did agree with petitioner that counsel was incorrect

26   when he indicated that second degree murder did not require a finding of malice. *Id.* at 34.

27   The record demonstrates, however, this error was corrected both by counsel and the trial

28   court.  Immediately after counsel made this statement, the trial court conferred with counsel

United States District Court

For the Northern District of California

1   at the bench, reminded defense counsel that second degree murder can be based on

2   implied malice, and invited him to correct his argument to the jury. *Id.* at 35.  Counsel did

3   so, resuming his closing argument and explicitly telling the jury that second degree murder

4   could be based on implied malice. *Id.*  Furthermore, the trial court properly instructed the

5   jury on the correct state of the law, i.e. that second degree murder can be based on implied

6   malice. *Id.*  The trial court's instruction outweighed any potential adverse impact from

7   counsel's argument and served to correct any misunderstanding by the jury that second

8   degree murder could not be found if there was malice. *See Boyde v. California*, 494 U.S.

9   370, 384-85 (1989) ("[A]rguments of counsel generally carry less weight with a jury than do

10  instructions from the court.  The former are not evidence, and are likely viewed as the

11  statements of advocates; the latter, we have often recognized, are viewed as definitive and

12  binding statements of the law.") (citations omitted); cf. *Greer v. Miller*, 483 U.S. 756, 766

13  n.8 (1987) (noting when a curative instruction is issued, a court presumes the jury follows

14  it).  In light of the corrections by counsel and the trial court, counsel's initial erroneous

15  statement about malice and second degree murder was unlikely to have any impact on the

16  outcome of the proceedings.

17       For the reasons described, reviewing counsel's closing argument as a whole reveals

18  that counsel did not "concede" to petitioner's guilt of first degree murder.  Furthermore,

19  counsel's failure to state explicitly that first degree murder required "premeditation" or

20  "deliberation" was neither deficient or prejudicial, particularly in light of the subsequent jury

21  instructions.  Finally, counsel's own corrections and the jury's curative instructions

22  eliminated any prejudice from counsel's initial erroneous statement that second degree

23  murder could not be predicated on malice.  Consequently, the state court's rejection of this

24  claim was neither contrary to nor an unreasonable application of *Strickland*, and petitioner

25  is not entitled to habeas relief on this claim.

26

27                                    **CONCLUSION**

28       For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  The

1  clerk shall close the file.

2       **IT IS SO ORDERED.**

3  Dated: March 2, 2009.

4                                                    PHYLLIS J. HAMILTON
                                                     United States District Judge

5

6

7

   G:\PRO-SE\PJH\HC.04\LELEI445.RUL.wpd

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California